# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| NASHVILLE PHARMACY SERVICES, LLC | ) | Case No. 3:18-bk-08144 |
| a/k/a NPS PHARMACY, | ) | Chapter 11 |
| | ) | **Judge Marian F. Harrison** |
| Debtor | ) | |

## DECLARATION OF CHAD GOODSON IN SUPPORT OF FIRST DAY MOTIONS

I, Chad Goodson, hereby declare under penalty of perjury that the following statements are true to the best of my knowledge, information and belief:

1. I am the Chief Financial Officer of Nashville Pharmacy Services, LLC also known as NPS Pharmacy ("NPS" or "Debtor").

2. NPS filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on June 29, 2018 (the "Petition Date"), commencing the above-captioned bankruptcy case (the "Chapter 11 Case").

3. I submit this declaration in support of Debtor's "First Day" motions in the Chapter 11 Case. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion, based upon my experience and knowledge of Debtor's business operations and financial conditions. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. Part I of this declaration describes Debtor's business and the circumstances surrounding the filing of the Chapter 11 petition. Part II sets forth the relevant facts in support of Debtor's First Day Motions filed concurrently herewith.

I.  **BACKGROUND**

   A. **The Chapter 11 Filing**

   5. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, Debtor is operating its business and managing its property as debtor-in-possession. Debtor continues to work on all existing contract on an uninterrupted basis and is prepared to enter contracts for new orders in accordance with its past ordinary business practices.

   6. No trustee or examiner has been appointed and no official committee of creditors or equity interest holders has yet been formed in the Chapter 11 Case.

   B. **Company Background and Events Leading to Bankruptcy**

   7. Debtor is an independent specialty pharmacy company that has been in business since 2001. On December 8, 2018 (the "Petition Date"), NPS filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). NPS continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed in this Chapter 11 Case.

   8. Specialty pharmacy refers to distribution channels designed to handle specialty drugs, which are pharmaceutical therapies that are used in the treatment of complex, chronic and/or rare health conditions. Over the years, NPS has become a very important provider of drugs used in the treatment of HIV infection. Over 90% of NPS's customers receive treatment for HIV infection and/or A.I.D.S. NPS works collaboratively with Nashville Cares, Chattanooga Cares, Neighborhood Health, ETSU Infectious Diseases Clinic, Positively Living, the Tennessee Department of Health and other organizations to provide life-saving drugs and other care to this vulnerable population.
2
Case 3:18-bk-08144    Doc 12    Filed 12/10/18    Entered 12/10/18 13:17:19    Desc Main
Document    Page 2 of 10

9. NPS currently dispenses drugs from three locations in greater Nashville, one in Paducah, Kentucky, and one in Johnson City on the campus of East Tennessee State University. NPS's total revenues exceed $100 million per year.

10. The profit margin for specialty pharmacies like NPS is very low, and one of the keys to profitability is the price at which drugs can be purchased from wholesalers. For several years prior to the fall of 2016, McKesson Corporation and its affiliates ("McKesson") were the wholesalers from which NPS bought most of its drugs. Starting in approximately February 2015, McKesson raised several times the price at which it would sell drugs to NPS. Over the course of the next year and a half, these increases raised NPS's cost of goods by more than $2.0 million. McKesson also indicated in 2016 that it was going to shorten significantly the 47 day payment terms historically given to NPS. McKesson demanded that this period be reduced to 17 days. Because of the large volume of drugs purchased by NPS, this reduction in terms would have required a lump sum payment to McKesson in excess of $8.0 million, and NPS did not have the ability to make this payment.

11. In the fall of 2016, NPS stopped purchasing drugs from McKesson and entered into a new contract with H.D. Smith, LLC. The new contract enabled NPS to purchase drugs at more favorable prices, but NPS still owes McKesson more than $14.0 million for drugs purchased prior to the termination of the parties' relationship. Since the fall of 2016, NPS has made several offers to McKesson regarding ways to deal with this debt, but none has been accepted by McKesson.

12. NPS's business stabilized after it started purchasing most of its drugs from H.D. Smith, LLC, but the existence of the McKesson debt has precluded NPS from being able to

3
Case 3:18-bk-08144   Doc 12   Filed 12/10/18   Entered 12/10/18 13:17:19   Desc Main
Document      Page 3 of 10

refinance its secured debt owed to Pinnacle Bank and has prevented NPS from entering into any strategic transactions.

13. NPS filed this bankruptcy case with the goal of reorganizing so that it can continue to provide life-saving drugs to its customers suffering from HIV infections and other chronic medical conditions.

## II. FIRST DAY MOTIONS AND APPLICATIONS

14. Along with Debtor's petition, Debtor filed certain motions for expedited relief (the "First Day Motions").

15. Generally speaking, the relief requested in the First Day Motions is necessary to facilitate continuation of Debtor's operations and services with little or no disruption. I believe that an expedited resolution of the issues raised in the First Day Motions is crucial to the success of Debtor's bankruptcy case and restoration of Debtor's normal business operations.

16. Specific factual information in support of each of the First Day Motions is provided below as well as in the various applications and motions.

### A. Prepetition Wages Motion

17. Debtor has filed an expedited motion requesting entry of an order authorizing payment of prepetition compensation, employee reimbursements, withholding taxes, and authorizing the continuation of all employee benefit plans, none of which payments will be in excess of the Bankruptcy Code's priority amount.

18. Debtor currently employees approximately 40 individuals. These employees are paid biweekly.

19. All employees are critical to Debtor's business. Debtor needs all employees in order to continue its business and generate revenue. Uninterrupted payroll and benefits are critical to keeping Debtor's employees, and thus critical to Debtor's business.

20. NPS runs payroll every other Friday, and employees are paid one week in arrears. The first pay date after the Petition Date will be Friday, December 21, 2018 and it will be for the period from December 2 through 15.

21. NPS's total payroll to non-owner employees every two weeks is approximately $115,000.

22. Included in payroll are certain benefits and reimbursements that NPS provides the employees, including: paid time off and other business expense reimbursements.

23. Debtor provides the employees with retirement and insurance benefits including, without limitation: a 3% matching contribution to a simple IRA retirement savings plan; paying a portion of the employee's health insurance, and a quarterly contribution to any employee's Health Savings Account (collectively "Benefits"). Debtor also administers certain other insurance plans that are paid for by the employees.

24. Debtor withholds required federal and state employment withholding taxes. Debtor pays these taxes on a regular basis to taxing authorities, along with Debtor's share of employment taxes, including without limitation unemployment taxes, social security taxes, and other payroll taxes.

25. Debtor has pre-petition withholding obligations with regard to the aforementioned benefits and taxes for employees. Debtor may also have had obligations as of the Petition Date for COBRA payments, and withholdings for garnishments and child support obligations.

26. The total amount owed for prepetition wages, expense reimbursements, and benefits does not exceed $12,850 for any employee of Debtor.

27. Debtor seeks authorization to pay the fall prepetition expenses owed to employees (the "Employee Expenses") and payment of all on-going salary and Benefits as and when they become payable, including the following:

(1) Wages, including paid time off, along with all federal, state and local payroll-related taxes, deductions and withholdings pertaining to such wage payments which arose prior to the Petition Date;

(2) Out-of-pocket business, cell phone and travel related expenses incurred by the employees which arose or accrued prior to the Petition Date;

(3) Insurance premiums relating to prepetition periods or otherwise arising prepetition; and,

(4) Payments to benefit plans or other third parties on account of deductions made from employees' Wages.

28. The employees are indispensable to Debtor's ongoing operations, and are necessary for continued generation of revenues and the administration and success of Debtor's bankruptcy case.

29. Payment of the Employee Expenses will not prejudice other creditors in these proceedings. Payment will ensure continued, uninterrupted operation of the Debtor's business and will contribute to the value of Debtor's estate and help to ensure the success of the Debtor's efforts in seeking Chapter 11 relief.

**B. Additional Debtor Representative**

30. Debtor has filed a motion to designate me as an additional person to act on behalf of the debtor and its estate in connection with this bankruptcy case.

31. Kevin Hartman, as the Chief Executive Officer, is the only person authorized by L.B.R. 4002-1 to perform any act required to be performed by the Debtor and to represent the Debtor at examinations, meetings and hearings in the Chapter 11 Case.

32. In my capacity as Chief Financial Officer of the Debtor, I am intimately involved in the day to day operation of the Debtor, and I am capable of representing the Debtor in the Chapter 11 Case, and it is appropriate that I be authorized to do so given the many financial issues that arise in a bankruptcy case.

33. Permitting me, in addition to Kevin Hartman, to sign the statement and schedules, testify at the meeting of creditors, attend meetings and hearings relative to this Chapter 11 Case, and perform any other obligations required by the Bankruptcy Code and Rules or the U.S. Trustee's guidelines will be to the benefit of the Debtor, its creditors, and the U.S. Trustee.

**C. Cash Collateral Motion**

34. Debtor intends to continue its business operations to maintain the value of its business, and use of the Debtor's accounts receivable and existing cash is critical to the ongoing operation of the Debtor's business and this Chapter 11 Case.

35. Debtor has immediate cash needs pending a final hearing on the Cash Collateral Motion, as it needs to pay for on-going labor and supplies, such as drugs purchased from H.D. Smith Company. Any delay could have serious consequences for Debtor's on-going business operation. Debtors' reorganization efforts require approval of the proposed Cash Collateral Motion, on an interim basis, to avoid immediate and irreparable harm to Debtor's estate, which will occur if this Motion is not granted. Without the immediate use of the proposed Cash Collateral Motion, Debtor could well be unable to continue operations. Debtor must immediately pay for employees, inventory, and amounts owed to its key customers and must take other action necessary to maximize the value of Debtor's assets.

36. It is critical that Debtor maintains the confidence of employees, suppliers, and customers in the Debtor's ability to meet their obligations while reorganizing its business. Continued cash availability is essential to the Debtor's ability to achieve this important aim. The

denial of use of Cash Collateral for these purposes would result in the immediate shut-down of the Debtor's operations, irreparably damaging the Debtor's ability to maximize the value of its business and its assets and causing substantial prejudice to the Debtor's estate, its creditors, and other parties-in-interest.

37. The budget attached to the Cash Collateral Motion has been prepared after consultation with Debtor's financial advisors. To the best of my knowledge, the budget is a reasonable and appropriate estimate of the amounts that will be received and paid in the ordinary course of this bankruptcy case during the first 6 weeks of this case. Debtor needs to have flexibility to spend up to 115% of the budget amounts because the amount of inventory that must be purchased each week depends on customer orders, which vary and cannot be predicted with precision.

38. Although several creditors have filed UCC-1 financing statements asserting a lien in some or all of Debtor's Cash Collateral, Debtor asserts that Pinnacle Bank ("Pinnacle") is the only creditor having a valid lien in Debtor's cash collateral. Pinnacle filed its initial financing statement on June 17, 2009, asserting a security interest in the Debtor's accounts and inventory. Pinnacle filed on April 7, 2017 a continuation statement reflecting its on-going security interest. Pinnacle has provided a working capital loan to NPS for many years and asserts that Debtor currently owes it approximately $3.5 million. NPS believes that Pinnacle has a perfected, first position security interest in Debtor's inventory and receivables and the proceeds therefrom.

39. At all times during the course of this case, the value of the collateral securing NPS's debt to Pinnacle will greatly exceed the amount owed. In addition to cash in its accounts, Debtor had as of the Petition Date accounts receivable in excess of $6.0 million. In addition to accounts receivable, Debtor maintained as of the petition date inventory having a value of more

than $2.0 million. Each sale of inventory to a customer generates a new account receivable. As inventory is sold, it is replenished by new purchases from H.D. Smith.

**D. Statement and Schedules**

40. Debtor has filed an emergency motion requesting additional time within which to file the required statements and schedules.

41. The Debtor has not had sufficient time to assemble all of the requisite financial data and other information required by the statements and schedules. To prepare this information, the Debtor must thoroughly examine its books, records and documents. The collection and review of this information will require substantial time and effort.

42. The Debtor's employees have been, and will continue to be, very busy performing work related to Debtor's ongoing business operation, as well as performing new duties necessitated by the filing of this Chapter 11 Case.

43. The volume of work required to be done by these employees in the immediate future warrants in favor of the Debtor's request for an extension of time to file statements and schedules. Additionally, the granting of an extension will aid the Debtor in filing complete and accurate schedules, thereby benefiting all parties in interest in this Chapter 11 Case.

44. The Debtor has already begun compiling the necessary information to complete the schedules as soon as possible. The Debtor and its professionals are currently in the process of reviewing information in connection with the preparation of the schedules. The Debtor expects to be able to complete this process on or before the extended deadline proposed herein, which is thirty (30) days after the Petition Date.

Further Declarant sayeth not.

This 10th day of December 2018.

/s/ Chad Goodson
Chad Goodson

Respectfully submitted,

/s/ Glenn B. Rose
Glenn B. Rose, TN Bar No. 10598
Paul G. Jennings, TN Bar No. 14367
Gene L. Humphreys, TN Bar No. 21807
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
grose@bassberry.com
pjennings@bassberry.com
ghumphreys@bassberry.com

and

Russell E. Stair
Bass, Berry & Sims PLC
1700 Riverview Tower
900 S. Gay Street
Knoxville, TN 37902
Tel: (865) 521-6200
Facsimile (865) 521-6234
rstair@bassberry.com

*Proposed Counsel for Debtor*

24984642.2